IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Kristen L. Mix

Civil Action No. 15-cv-00465-KLM

GABRIEL RODRIGUEZ-AGUIRRE,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____

# FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT
_____

This case was tried to the Court on March 28-29, 2019. The parties subsequently submitted post-trial briefs [# 158, #160],[1] which the Court has considered. For the reasons set forth in this Order, the Court generally resolves the issues in favor of the Defendant.

## FINDINGS OF FACT

1. At the time of the events which led to this lawsuit, Plaintiff Gabriel Rodriguez-Aguirre ("Mr. Rodriguez-Aguirre" or "Plaintiff") was an inmate at the Federal Correctional Institution in Englewood, Colorado ("FCI Englewood"). [#159] at 1.

2. On December 26, 2012 at approximately 9:00 a.m., Plaintiff slipped and fell in the Education Building at FCI Englewood. [#159] at 2. The Education Building houses the Education Department. Plaintiff fell during an inmate movement period. Inmate movement

---

[1] [#159] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

1

periods occur every hour throughout the day beginning at 7:00 a.m. [#159] at 8.

3. On December 26, 2012, the weather in Englewood, Colorado, was sunny and cold. There was some accumulated snow on the ground outside the Education Building from prior snowfall. [#159] at 13.

4. There was water on the floor of the Education Building at the time and in the location of Plaintiff's fall. [#161-1] at 3.

5. Plaintiff did not see the water before he fell. [#161-1] at 5-6.

6. Plaintiff fell because he slipped in the water. [#161-1] at 5.

7. Plaintiff was 67 years old at the time of the fall. He had a history of chronic injuries and illnesses including dizziness, vertigo, syncope, diabetes, low back pain, kidney disease, headaches, left shoulder degenerative joint disease, peripheral polyneuropathy, reflux disease, hypertension, epicondylitis and postural hypertension. [#159] at 11.

8. Plaintiff severed the quadriceps tendon in his right leg as a result of the fall. He received medical treatment, including surgery, following the fall. [#132] at 3. Plaintiff suffered pain in his right leg as a result of the fall and thereafter. The functioning of his right leg is permanently impaired as a result of the fall. [#161-1] at 19-20. Plaintiff's medical care relating to the fall was paid for by the United States Bureau of Prisons ("BOP"). [#159] at 16.

9. The source of the water on the floor of the Education Building on December 26, 2012 is unknown, as is the exact time when the water appeared.

10. In December of 2012, FCI Englewood had an Institution Plan Housekeeping/Sanitation policy (the "Institution Plan"). [#159] at 7.

11. The Education Department had a staff of approximately 15 to 23 inmate

orderlies who were responsible for maintaining the floors in the Education Building, including cleaning the floors and ensuring that they were dry during inclement weather. [#159] at 3.

12. The inmate orderlies were primarily supervised by Education Technician Shellie Taylor. [#159] at 4. Ms. Taylor was not at work in the morning on December 26, 2012 when Plaintiff fell. [#161-1] at 15.

13. The inmate orderlies received training on how to perform their jobs, including using caution signs to mark wet floors, placing floor mats on the floors, and cleaning the floors in the Education Department so that the floors would be dry during inmate movements. [#159] at 4-5.

14. If staff within the Education Department noticed wetness on the floor, they would instruct the inmate orderlies to clean that area or they would notify Ms. Taylor of the wetness. [#159] at 8.

15. It was the regular practice of staff at FCI Englewood to place floor mats in high traffic areas such as entryways, including a carpeted floor mat inside the entryway to the Education Building. [#159] at 6-7. It was also the regular practice of staff to place a rubber drainage mat outside the main entrance to the Education Building. [#159] at 7.

16. It was the regular practice of staff and inmate orderlies at FCI Englewood to use caution signs when a floor was being cleaned. Caution signs were also used in the Education Building when moisture was tracked onto the floor due to inclement weather. [#159] at 7.

17. FCI Englewood staff instructed inmate orderlies to mop the floors between inmate movements on days of inclement weather. [#161-1] at 11.

18. There were several ways for inmates to notify staff at FCI Englewood of a complaint regarding unsafe floor conditions. Supervisors and the head of the Safety Department were present at mealtimes so that inmates could voice concerns. Inmates could notify staff in the department where the problem arose. Inmates could also write a letter to the relevant Detail Supervisor or Department Head about a complaint. [#159] at 10.

19. There is no evidence of any complaint about unsafe floor conditions in the Education Building around the time of Plaintiff's fall. [#159] at 12.

20. There is no evidence that staff at FCI Englewood were aware of chronically wet floors or chronically unsafe floor conditions in the Education Building prior to Plaintiff's fall. [#159] at 11.

21. There is no evidence that staff at FCI Englewood were aware that the floor was wet in the Education Building on the morning of December 26, 2012.

22. The staff at FCI Englewood were not aware of any falls in the Education Building before Plaintiff's fall on December 26, 2012. [#159] at 12.

**CONCLUSIONS OF LAW INCLUDING ADDITIONAL FINDINGS**

Plaintiff's claim is brought under the Federal Tort Claims Act ("FTCA"), which provides a limited waiver of the federal government's sovereign immunity. 28 U.S.C. § 1346(b) and §§ 2671-80. Section 1346(b) of the FTCA provides that the government is liable for the negligent or wrongful acts of its employees to the same extent as a private person "in accordance with the law of the place where the act or omission occurred." Because the alleged negligence at issue here occurred within the State of Colorado, the Court applies Colorado law. *Levin v. United States*, 568 U.S. 503, 506-07 (2013).

Under Colorado law, the Premises Liability Act ("PLA") provides the exclusive

4

remedy against a landowner for injuries sustained on the landowner's property. *Thornbury v. Allen*, 991 P.2d 335, 340 (Colo. App. 1999); *see also Sofford v. Schindler Elevator Corp.*, 945 F. Supp. 1459, 1461 (D. Colo. 1997). The PLA imposes certain duties on a landowner depending on the claimant's status as a trespasser, licensee or invitee. Colo. Rev. Stat. § 13-21-115(a). The parties agree that Plaintiff was an invitee of the Bureau of Prisons at the time of his fall. *Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law* [#161-1] at 22; *Defendant's Revised Proposed Findings of Fact and Conclusions of Law* [#159] at 19. Under the PLA, an "invitee may recover for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known." Colo. Rev. Stat. § 13-21-115(3)(c)(1).

The issue in this case is whether any representative of the landowner – i.e., an employee of the Bureau of Prisons – "actually knew or should have known" of the alleged dangerous wet floor, and whether any such person "unreasonably fail[ed] to exercise reasonable care" to protect against it. Colo. Rev. Stat. § 13-21-115(3)(c)(I). As I have concluded above, there is no evidence that any representative of the landowner actually knew about the dangerous wet floor in the Education Building on December 26, 2012 prior to Plaintiff's fall. Hence, under the PLA, the question becomes whether any representative of the landowner "should have known" about it.

Plaintiff argues that "BOP staff members [] should have known that inmate orderlies were not performing their duties and effectively left the orderlies unsupervised," and that "the orderlies themselves . . . failed to mop as BOP policies required to be done that day or were negligent in doing so. . . ." *Plaintiff's Post-Trial Brief* [#158] at 3.

Plaintiff's arguments are unavailing. First, there is no evidence suggesting that BOP

5

staff should have known that inmate orderlies were either not performing their floor-cleaning duties or were performing them negligently on December 26, 2012. The record is completely devoid of any non-speculative evidence about the floor maintenance performed or not performed by inmate orderlies in the Education Building that day.[2] No witness testified with any degree of certainty about what floor maintenance activities, if any, occurred before Plaintiff's fall. Without such evidence, Plaintiff is reduced to arguing that because it had snowed the day before Plaintiff's fall, because snow sometimes gets tracked into buildings and generally melts indoors, because the Education Building floors were tile, because BOP knew that wet floors could cause problems, and because BOP trained inmates to mop wet floors, BOP should have known that there was a dangerous wet floor in the Education Building on December 26, 2012. The logic of this argument is manifestly faulty. Basically, it amounts to a contention that BOP "should have known" of the existence of dangerous floor conditions in the Education Building every moment of every day after a snowfall, regardless of the weather, foot traffic and the occurrence or degree of floor maintenance activities undertaken on any given day. Such a conclusion is simply not rational, nor is it supported by the evidence.

Second, Plaintiff's argument is undermined by the applicable legal standard regarding proof of a dangerous condition under the PLA. Under Colorado's objective standard, Plaintiff is required to prove that the dangerous condition had existed for such a

---

[2] Aside from testimony about how BOP trains inmates to mop wet floors and how mopping is generally accomplished (e.g., by using buckets imprinted with caution signs or warning signs indicating the presence of wetness), there was no conclusive testimony or other evidence about the existence or extent of any mopping of the floors in the Education Building on December 26, 2012. *See infra* at pp. 7-9.

period of time and was of such a nature that, in the exercise of reasonable care, the condition and its dangerous character should have been discovered. *Clemmons v. FC Stapleton II, LLC*, 485 F. App'x 904, 908 (10th Cir. 2012) (unpublished); *Watts v. Home Depot U.S.A.,* No. 17-cv-1320-WJM-MEH, 2019 WL 1077369 at *6 (D. Colo. Mar. 7, 2019) (finding the PLA requires plaintiff to present evidence of "specific knowledge of the danger, rather than generalized knowledge that poor conditions exist.") There is no such evidence in the case before the Court. Not only did Plaintiff admit his own lack of awareness of the puddle prior to falling, but no other witness testified that he or she knew of the dangerous wet floor which caused Plaintiff's fall.

The relevant testimony was as follows:

- Plaintiff did not see the puddle of water on the floor until after he slipped. [#161-1] at 5; Tr. Vol. I at 209:25-210:1; 211:4-6. At trial, Plaintiff testified that he saw no one cleaning the floor before he fell. Tr. Vol. II at 281:4-6. However, in his deposition, Plaintiff testified that earlier on the morning of his fall he saw orderlies with mops in the area where he fell. *Id.* at 315:15-25. The record of Plaintiff's visit to the doctor immediately after his fall states that he told the doctor "they were cleaning the floor, and I slipped and fell." Exh. A-28. When asked about that statement at trial, Plaintiff responded that he had instead told the doctor "they *weren't* cleaning the floor, is why I fell." Tr. Vol. II at 338:4-339:7. Plaintiff also provided inconsistent statements about whether the wetness on the floor was from mopping or from moisture being tracked in from the outdoors, *id.* at 323:4-11; 335:20-336:2; whether there were floor mats in the lobby of the Education Building on December 26, 2012, *id.* at 325:3-326:7; and whether he ever saw caution signs on the floors of the Education Building. *Id.* at 325:9-326:25.[3]

- Emily Finch is a former inmate teacher at FCI Englewood and the only employee of Defendant who saw Plaintiff fall. But Ms. Finch did not observe wetness on the floor of the Education Building prior to Plaintiff's fall. [#159] at 21. According to Plaintiff, at 7 a.m. on December 26, 2012, Ms. Finch unlocked the door of the Education Building to let the inmates into the

---

[3] All references are to the unofficial transcript of the trial that occurred on March 28-29, 2019.

- Building. Tr. Vol. II at 278:10-13.  But despite Ms. Finch's proximity to inmates entering the building that morning, she testified that she was surprised to see water on the floor at the time of Plaintiff's fall.  Depo. of Emily Finch at 92:8-17.  Prior to Plaintiff's fall on December 26, 2012, she did not see anyone mopping the floor and does not recall seeing any wet floor signs. *Id.* at 108:9-18; 168:14-25.  No inmate told her that the floors were wet or slippery that day. *Id.* at 116:22-25.  She never saw anyone else slip and fall in the Education Building.  *Id.* at 117:1-3.

- Former BOP foreman Chad Stark testified that inmates are responsible for making the floor safe to walk on "if they see a wet area," and that during inclement weather they clean floors "on an as-needed basis."  He further stated that he did not know whether inmate orderlies had been instructed to mop more often on December 26, 2012 due to inclement weather. Tr. Vol. I at 56:20-25; 57:4-6; 66:22-67:3.

- Inmate Jeffrey Steele slipped "a couple different times" near where Plaintiff fell in the Education Building, but he did not actually fall, he never brought the incidents to anyone's attention, and he did not file any administrative remedy requests regarding those incidents.  Depo. of Jeffrey Steele at 12:2-16; 35:11-18; 78:7-10.  Mr. Steele was not present at the time of Plaintiff's fall. *Id.* at 15:8-12. Although Mr. Steele saw other inmates fall in the Education Building at various times, he does not know whether those inmates reported their falls or brought the falls to the attention of staff.  *Id.* at 24:8-20.  He does not know whether any such falls led to medical treatment.  *Id.* at 31:16-23.  He speculates that some of the Education staff knew about the floors getting wet during inclement weather because they locked and unlocked the front door to the Building and "had to have an idea because they were right there." *Id.* at 55:4-16.  However, as noted above, although the testimony established that Ms. Finch unlocked the door for inmates on the morning of December 26, 2012, she expressed surprise that there was water on the floor two hours later.

- Inmate Miguel Rodriguez-Pantojas admitted that he had no personal knowledge or reason to believe that anyone from BOP knew about wetness on the floor of the Education Building before Plaintiff fell.  Depo. of Miguel Rodriguez-Pantojas at 61:18-22.

- Former inmate teacher Kisha Barnes testified that Shelly Taylor was the person with direct supervisory responsibility over the inmate orderlies, and when Ms. Taylor was not working, that responsibility rotated among teachers. Tr. Vol. II at 355:19-25. Ms. Barnes did not recall ever instructing orderlies to mop between inmate movements when it was snowing heavily outside.  *Id.* at 358:16-21.  However, she also did not recall having any concerns that inmate orderlies were not properly trained or supervised.  *Id.* at 364:5-10.

8

- She thought the inmate orderlies did a very good job. *Id.* at 376:13-15. Floor mats were always used inside the entrance to the Education Building. *Id.* at 364:24-25. She does not recall a time working in the Education Department when she thought that floor mats or wet floor signs should be used but they were not. *Id.* at 365:10-13; 368:4-8. She does not recall any inmate or staff member ever telling her that the floor was slippery, she never saw anyone slip or fall in the Education Department lobby, and she never noticed wet or slippery floors there. *Id.* at 369:15-370:4.

- Former education technician Shelly Taylor testified that she supervised the inmate orderlies who maintained the floor in the Education Building. Tr. Vol. II at 379:20-22. The inmate orderlies were instructed to mop between inmate movements "if it was wet outside" or if it was raining or snowing. *Id.* at 380:9-22. Between 15 and 23 inmate orderlies were authorized to work per shift. *Id.* at 389:1-4. The inmate orderlies used very large dry mops to clean the hallway floors between inmate movements. *Id.* at 392:3-14. Since 2010 the Education Building had floor mats in the front door area and in front of the kiosk and inmate copy machine. *Id.* at 393:21-394:1; 400:15-20. When mopping, the inmate orderlies used large yellow industrial mop buckets with red "caution" lettering on the side. *Id.* at 395:18-21. Inmates could report wetness on the floor by telling Ms. Taylor or any other officer, writing a copout, or by telling the executive staff at meals. Ms. Taylor was not told of a wet floor in the lobby of the Education Building and never saw anyone slip or fall there. *Id.* at 397:23-398:24. She does not believe that the floors in the Education Building were often wet, because if they were she would have fallen given the amount of walking she did in the Building. *Id.* at 400:8-14.

- Former Supervisor of Education at FCI Englewood Robert Malonson testified that inmate orderlies were trained at least on an annual basis. Tr. Vol. II at 419: 2-9. He confirmed the regular presence of floor mats in the Education Building in 2012, both a wide mat in the front lobby and runner mats in the center of the main hallway. *Id.* at 424:17-426:23; 427:20-428:12. He stated that the inmate orderlies had access to a supply closet throughout the day, and the closet contained yellow caution signs to be used on wet floors, whether due to mopping or wet weather. *Id.* at 426:24-429:20. He stated that he does not recall any inmate, including Plaintiff, ever telling him about a slippery floor in the Education Building, he never saw anyone slip or fall in the Education Building and he did not do so himself. *Id.* at 433:1-18.

- Former Safety Manager at FCI Englewood Judd Motchan testified that inmate orderlies were trained on a quarterly basis regarding floor maintenance. Tr. Vol. II at 440:4-13. He further testified that approximately 150 floor mats of varying sizes were ordered for the facility between July of 2011 and March of 2012. *Id.* at 442:14-445:23. He visited the Education

9

- Building at least once per month to conduct safety checks, and did not recall seeing wet floors there aside from during cleaning. *Id.* at 447:25-448:10. He never saw anyone fall in the Education Building and did not have concerns about wet floors there. *Id.* at 448:11-21.

- Former inmate teacher Jenny Schultz confirmed the presence of multiple floor mats in the Education Building on a regular basis. Tr. Vol. II at 460:20-461:11. She identified a photograph of the floor mats in use in 2012 and described them as black with fabric material on top and non-skid rubber underneath. *Id.* at 462:25-463:18. She did not recall ever seeing a mat soaked through to the degree that it could no longer absorb water. *Id.* at 463:19-22. She also did not recall a time when there was a need for mats but no mats were placed on the floor, or when the floors were wet due to cleaning or inclement weather and no caution sign was displayed. *Id.* at 463: 23-464:22. She confirmed that she had a good view of the Education Department lobby from her office but never saw an inmate slip or fall there, and never heard of either an inmate or a staff member falling there, including herself. *Id.* at 467:12-468:3.

The overwhelming weight of the evidence establishes that the Defendant took reasonable precautions to maintain the floors in the Education Building in a safe condition regardless of weather. Although the evidence also establishes that there was water on the floor of the Building on the morning of December 26, 2012 which caused Plaintiff to fall, there is simply no credible evidence that any representative of Defendant should have known of the existence of the hazard that morning. In light of the inmate movements which occurred throughout the Education Building prior to Plaintiff's fall and the lack of any other complaints about wet floors or resulting mishaps that day, it is more reasonable to conclude that no one should have known of any specific danger on December 26, 2012.

Moreover, even assuming, *arguendo,* that Plaintiff's contention that inmate orderlies are government "employees" for purposes of the FTCA is correct, his argument fails. The argument depends on the existence of government policies and/or practices requiring the inmate orderlies to mop when the floor was wet. First, as mentioned above, there is simply

no evidence that any representative of Defendant, including any inmate orderly, should have known of the dangerous wet floor on December 26, 2012. But more importantly, if it were correct that BOP's policies and practices requiring inmate orderlies to mop between movements on days of inclement weather establish that the government should have known of the specific danger Plaintiff confronted on December 26, 2012, every government policy or practice to reduce risks of harm to invitees would create liability for every mishap, regardless of the absence of facts establishing that government "employees" should have had specific knowledge of a specific danger at a specific time. The law is to the contrary.

Plaintiff has failed to carry his burden of showing by a preponderance of the evidence that any representative of the Bureau of Prisons knew or should have known of the wet floor prior to Plaintiff's fall. As a result, Plaintiff has filed to establish by a preponderance of the evidence that any negligent or wrongful act was the cause of his fall on December 26, 2012.

**ORDER**

IT IS HEREBY **ORDERED** Plaintiff's claim against Defendant under the Federal Tort Claims Act and Colorado Premises Liability Act is resolved in favor of the Defendant. Accordingly,

IT IS FURTHER **ORDERED** that judgment shall enter in favor of the Defendant, United States of America, and against the plaintiff, Gabriel Rodriguez-Aguirre.

Dated this 25th day of November, 2019.

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge